## UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

In re

IRA J. PRESSMAN

PJI DISTRIBUTION CORP.,

                    Debtors.

LYNN FELDMAN, AS TRUSTEE FOR THE
BANKRUPTCY ESTATES OF IRA PRESSMAN
AND PJI DISTRIBUTION CORP.,

                    Plaintiff,

                    v.

SCOTT DICLAUDIO,

                    Defendant.

Bky. Nos. 11-13080 (ELF)
and 11-13082 (ELF)

JOINTLY ADMINISTERED
AND SUBSTANTIVELY
CONSOLIDATED

Adversary Proceeding No. _____

## COMPLAINT

Plaintiff, Lynn E. Feldman, the Chapter 7 Trustee (the "Trustee" or "Plaintiff") for the

consolidated bankruptcy estates (the "Estates") of Ira J. Pressman ("Pressman") and PJI

Distribution Corp. ("PJI" and, together with Pressman, "Debtors"), by and through her

undersigned attorneys, Duane Morris LLP, hereby files this Complaint against the Defendant,

Scott DiClaudio ("Defendant" or "DiClaudio"), to: (i) avoid and recover certain fraudulent

transfers made to or on behalf of the Defendant; and (ii) recover damages for the Debtors' unjust

enrichment of the Defendant and for payment of usurious interest to DiClaudio, as more fully

described herein.[1] In support thereof, the Trustee avers as follows:

---

[1] Plaintiff reserves the right to bring additional claims against the Defendant and nothing contained herein shall be
deemed a waiver of any rights or causes of action that the Trustee or the Estates may have against the Defendant.

## NATURE OF THE ACTION

1.      On July 22, 2011, Pressman, as part of a plea agreement with the United States of America, Department of Justice, admitted that he had operated, for at least five (5) years, an elaborate, multi-million dollar fraudulent Ponzi scheme (the "Scheme") by which he stole money from his friends, members of his religious community, and fellow members of an addiction recovery community, all under the guise of purportedly legitimate, "no-risk" opportunities to invest in the purchase and resale of overstock inventory.

2.      In fact, these opportunities were everything but legitimate and "no-risk"—instead, they were sham transactions fraudulently designed to keep the Scheme alive.

3.      As detailed more fully herein, the Defendant was the recipient of significant transfers, transfers which were made by the Debtors with the express intent of hindering, delaying or defrauding their creditors and in furtherance of the Scheme.

4.      Not only did these transfers enable the Defendant to receive significantly more than he had "invested," these transfers also rendered the Debtors insolvent.

5.      Despite being on notice to investigate the questionable circumstances surrounding the business deals presented to him, the Defendant—who, by all accounts, is a well-educated and intelligent professional—conducted only minimal diligence, ignored a multitude of "red flags," and, instead, chose to do little more than to accept the ridiculously inflated returns on his purported "investments".

6.      By this Complaint, the Trustee seeks to avoid these transfers--transfers of the Debtors' assets to the Defendant that were made as part of Pressman's confessed, criminal Ponzi Scheme--pursuant to 11 U.S.C. §§ 544(b) and 548 and by the Pennsylvania Uniform Fraudulent

Transfer Act, 12 Pa. C.S. §§ 5101-5110 and to recover these transfers (or the cash equivalent thereof) from the Defendant pursuant to 11 U.S.C. § 550.

## JURISDICTION AND VENUE

7.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 157 and 1334.

8.     This Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367(a).

9.     This is an adversary proceeding pursuant to Rule 7001, *et seq.* of the Federal Rules of Bankruptcy Procedure and 11 U.S.C. §§ 544, 548 and 550.

10.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409 because this adversary proceeding arises under and in connection with a case under 11 U.S.C § 101, *et seq.* (the "Bankruptcy Code").

11.     This matter is a "core" proceeding pursuant to 28 U.S.C. § 157(b).

## PARTIES AND PROCEDURAL BACKGROUND

12.     Plaintiff, Lynn E. Feldman, is the court-appointed Chapter 7 Trustee for the bankruptcy estates of Pressman and PJI, a Pennsylvania corporation.

13.     On April 15, 2011, certain creditors of the Debtors—Steve Kammerman, Eric and Renee Bland, Daniel Hughes, Timothy Calnon, and Steven Kapustin—filed an involuntary petition for relief against both of the Debtors under chapter 7 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Pennsylvania (the "Court").

14.     On May 19, 2011, the Court entered an Order for Relief and on or about May 20, 2011, the Trustee was appointed.

15.     On August 29, 2012, the Court entered an Order substantively consolidating the chapter 7 Estates of Pressman and PJI.

16.    The Defendant, Scott DiClaudio, is a citizen of Pennsylvania, with a principal

place of business at Two Penn Center, Suite 900, Philadelphia, PA    19102, and, upon

information and belief, a residence located at 109 Sawgrass Drive, Blue Bell, PA  19422.

## FACTUAL BACKGROUND

### Pressman Develops The Scheme[2]

17.    Prior to the commencement of the Bankruptcy Cases, Pressman was the principal

of PJI, an entity formed in the summer of 2006 through which Pressman could buy and sell

closeout surplus merchandise and/or overstock inventory.

18.    From its formation until being forced into bankruptcy, Pressman single-handedly

controlled PJI, making the day-to-day decisions about its business "operations", which in reality

was a front for the Ponzi scheme through which the Debtors misappropriated the assets of others

under the guise of running a purported "closeout business."[3]

19.    In theory, PJI's business model was premised upon the following:  it would

purchase closeout/overstock merchandise at a discount price and re-sell it to other vendors at a

higher price.

20.    Ostensibly, in order to facilitate PJI's ability to "buy" such merchandise,

Pressman, individually and on behalf of PJI, would solicit funds from third party "investors" and

propose that these investors advance the funds necessary to buy the closeout/overstock items so

that Pressman, through PJI, could resell the merchandise at a much higher price.

---

[2] The allegations set forth in the paragraphs hereinbelow and including, without limitation, in the Criminal Information filed by the United States Attorney and Pressman's subsequent Guilty Plea Agreement, describe what is herein referred to as the "Scheme" or "Pressman's Scheme."

3 A closeout business involves the sale and/or re-sale of merchandise at very low prices, often to sell off the remainder of stock that did not sell in the normal course in retail stores, sometimes due to irregularities and/or defects in the goods.  In addition to "store remainders" and irregular goods, seasonal goods, store closing merchandise, old products that have subsequently been replaced by newer goods as well as returns or re-conditioned items are also examples of "closeout" merchandise.

21.     Indeed, as part of his "sales pitch" to new investors, Pressman would inform the investors that he needed their money for only a short period of time so that PJI could purchase the merchandise from one vendor and then quickly resell (usually within a 30- to 90-day timeframe) the same merchandise to another vendor at a substantial profit.

22.     Pressman promised the investors a substantial return on their investments, sometimes informing investors that they could earn well in excess of a one hundred percent (100%) return (annualized) on their investment.

23.     However, virtually all of the "deals" that Pressman, on behalf of PJI, proposed to investors and purportedly entered into by such investors were fictitious and fraudulent.

24.     As admitted by Pressman, shortly after the formation of PJI in July 2006, the Debtors' ability to generate sufficient cash to repay the investors became constrained and, as such, the Debtors started to seek new investors—however, the money he received from these investors was not used to buy closeout inventory; rather, it was used to repay the "old" investors their promised returns.

25.     Amazingly, in some cases, investors blindly gave the Debtors money—and did so repeatedly—based on Pressman's oral representations, memoranda, and promises of incredible profits, never once asking for any underlying paperwork supporting the supposed deal and never doing background checks or research into the Debtors' business operations.

26.     In other cases, the investors received "invoices" and/or "purchase orders" for the products that were the subject of the supposed deals.

27.     In reality, however, these invoices and/or purchase orders were fabrications created by the Debtors.

28.     While the Debtors attempted to make the invoices and/or purchase orders look similar to real documents, they contained information that should have caused a reasonable investor—or any reasonable and prudent person—to inquire further.

29.     For example, in one email to an investor, Pressman, on behalf of PJI, advised that he had a transaction lined up to buy and sell 300,000 dozen pairs of socks (*i.e.*, *3.6 million pairs of socks*) over the course of 30-40 days, and promised the potential investors a 33% profit (to be paid within such timeframe) if they provided the financing to fund the deal.

30.     Putting aside the fact that 300,000 dozen pairs of socks is an astronomical number, the fact remains that these socks were purportedly "closeout" inventory—meaning that they were merchandise that had not been sold by a prior retailer--and, thus, investors should have been at least a little bit leery of the Debtors' sudden ability to "move" such a vast amount of previously unsold closeout inventory in such a quick period of time.

31.     Even if the size and nature of the inventory did not create sufficient pause for the investor, the investor also should have been on notice of fraudulent activity in light of the astronomical return promised on account of the investment. A thirty three percent return—for a forty day period--translates into an annual return in excess of three hundred (300%)!

32.     It is widely recognized that an unusually high rate of return is the most common telltale sign of a Ponzi scheme and that investment earnings of 10% a year or above are a suspicious, investment fraud "red flag."[4]

33.     In the case of PJI, the returns promised to the investors, including the Defendant herein, far exceeded 10% a year.

---

[4] *See, e.g.*, http://www.sequenceinc.com/fraudfiles/2012/01/ponzi-scheme-investment-fraud-red-flags.

34.    In the Defendant's case, DiClaudio received investment returns of approximately 30% over very brief, two- to three-month time periods—annualized, these returns ranged from 120% to more than 150%!

35.    Moreover, at the time of most, if not all, of the five-year period during which Pressman perpetrated the Scheme, the nation—and the world—was in the midst of a global financial crisis, considered by many economists to have been the worst financial crisis since the Great Depression of the 1930s, resulting in the collapse of large financial institutions, the bailout of banks by national governments, downturns in stock markets around the world, foreclosures and other negative developments in the U.S. housing market, failures of key businesses, prolonged unemployment, declines in consumer wealth estimated in trillions of U.S. dollars, and a significant decline in economic activity, both nation- and world-wide.[5]

36.    The anomalous and astronomical returns promised by the Debtors, at a time when the economy was in shambles, were neither credible nor consistent with legitimate business activity, and should have caused any reasonable person to shy away from such "deals" or, at the very least, to inquire closely as to the bona fides of such deals.

37.    In addition, 2009 and 2010 (years when the Scheme was in full force) were years when the public, including, without limitation, reasonable investors and sophisticated professionals such as the Defendant herein (and, indeed, any reasonable and prudent person), had and/or should have had a heightened sense of awareness about Ponzi schemes in light of the tremendous publicity surrounding the Madoff Ponzi scheme—and other Ponzi schemes—which became known at or around this same time.

---

[5] *See, e.g.*, http://en.wikipedia.org/wiki/Late-200s_financial _crisis, and sources referenced therein.

38.     Indeed, on or about December 11, 2008, Bernard L. Madoff ("Madoff") was arrested for violation of criminal securities laws, and on or about March 12, 2009, Madoff pled guilty to an eleven-count criminal information filed against him by the United States Attorneys' Office in the Southern District of New York, admitting that he had operated an elaborate, fraudulent Ponzi scheme.

39.     On or about June 29, 2009, Madoff was sentenced to 150 years in prison. Other participants in Madoff's Ponzi scheme pled guilty to participating and conspiring to perpetuate the Ponzi scheme during the Summer of 2009. The Madoff Ponzi scheme was widely reported in the press throughout the United States, including, but not limited to, Pennsylvania.

40.     Numerous other Ponzi schemes, like the Madoff Ponzi scheme, were widely reported in the press, including, without limitation, in Pennsylvania and in the local press in various suburbs of Philadelphia. These other highly publicized Ponzi schemes included, but were not limited to, the following:

a.      In or about December 2008, Broomall, Pennsylvania resident, Joseph Forte ("Forte"), was arrested for violation of criminal securities laws, and in or about June 2009, Forte pled guilty to a four-count criminal information filed against him by the United States Attorneys' Office in the Eastern District of Pennsylvania, admitting that he had operated an elaborate, $80 million fraudulent Ponzi scheme perpetrated on individuals and entities in the Philadelphia area by promising investors returns in the range of 18 to 38 percent. In or about November 2009, Forte was sentenced to 15 years in prison. The Forte Ponzi scheme, including the nature of that scheme and the consequences of conducting and/or participating in that scheme, was widely reported in the press throughout the United States, including, but not limited to, Pennsylvania, as

well as locally in various Philadelphia suburbs, beginning in at least January 2009 and continuing through at least September 2010.

b.      In or about April 2009, the Securities and Exchange Commission ("SEC") charged Kennett Square, Pennsylvania resident, Anthony Young ("Young"), with civil fraud in connection with his operation of various Kennett Square-based investment advisory businesses under various names, including Acorn Capital Management LLC ("Acorn"), through which Young solicited individuals to invest with him, claiming that he would invest their funds in the stock of large, stable companies, but really stealing and misappropriating the investors' money. In or about April 2010, Young was indicted by a grand jury in proceedings brought by the United States Attorneys' Office in the Eastern District of Pennsylvania, and in or about July 2010, Young pled guilty to having operated a $35 million fraudulent Ponzi scheme perpetrated on individuals and entities in the Philadelphia area. The Young/Acorn Ponzi scheme, including the nature of that scheme and the consequences of conducting and/or participating in that scheme, was widely reported in the press, including, but not limited to, in Pennsylvania and in various local Philadelphia suburbs, beginning in at least November 2009 and continuing through at least July 2010.

c.      In or about November 2009, the SEC charged two (2) Manayunk, Pennsylvania residents, Troy Wragg and Amanda Knorr, with civil fraud in connection with their operation of a Bala Cynwyd company, Mantria Corp. ("Mantria"), that was a Ponzi scheme through which Wragg, Knorr and Mantria defrauded investors of between $30 and $50 million by making false promises of enormous returns from the development of housing and green technology. The Mantria Ponzi scheme, including the nature of that

scheme and the consequences of conducting and/or participating in that scheme, was widely reported in the press, including, but not limited to, in Pennsylvania and in various local Philadelphia suburbs, beginning in at least November 2009 and continuing through at least February 2011.

d.      In or about April 2010, Main Line investment adviser Barry Bekkedam ("Bekkedam") and his firm, Radnor, Pennsylvania-based Ballamor Capital Management, Inc. ("Ballamor"), were named as defendants in a Florida lawsuit related to a $1.2 million Ponzi scheme  perpetrated by Scott Rothstein ("Rothstein"), who pled guilty in January 2010 to five (5) criminal counts of racketeering, fraud, and money laundering.  Investors who participated in the Rothstein Ponzi scheme were promised a 15% return on money that would be used to buy legal settlements.   The Rothstein Ponzi scheme and, in particular, the involvement of Bekkedam and Ballamor therein, the nature of the scheme, and the consequences of conducting and/or participating in that scheme, were widely reported in the press, including, but not limited to, in Pennsylvania and in various local Philadelphia suburbs, beginning in at least November 2009 and continuing through at least August 2010.

e.      In or about June 2010, the SEC charged Berwyn, Pennsylvania resident, Robert Stinson ("Stinson"), with civil fraud in connection with his theft and misappropriation of investors' money through the fraudulent operation of his companies, including the Chesterbrook, Pennsylvania-based Life's Good Inc. ("Life's Good"), by promising investors annual returns of 10% to 16%  on real estate investments; in or about November 2010, Stinson was indicted by a grand jury in proceedings brought by the United States Attorneys' Office in the Eastern District of Pennsylvania, and in or about

August 2011, Stinson pled guilty to having operated a $17 million fraudulent Ponzi scheme perpetrated on individuals and entities in the Philadelphia area. The Stinson/Life's Good Ponzi scheme, including the nature of that scheme and the consequences of conducting and/or participating in that scheme, was widely reported in the press, including, but not limited to in Pennsylvania and in various local Philadelphia suburbs, beginning in at least June 2010 and continuing through at least August 2011.

41.     The publicity associated with the Madoff Ponzi scheme and the other, local—but nevertheless much-publicized—Ponzi schemes which came to light during this time frame should have sensitized the investors (including the Defendant herein) to the illegitimacy of the business deals being promised by the Debtors, and put these investors, including the Defendant herein, on notice that these deals were "too good to be true."

42.     The previously-referenced "sock deal" was only one of many deals that the Debtors used to attract and retain investors.

43.     Like the "sock deal," other fictitious "deals" also involved: (i) huge amounts of merchandise; (ii) being purchased from one vendor and then resold to another vendor; (iii) for huge returns (at least 25-33% returns); and (iv) over a relatively short period of time (*e.g.,* two to three months).  In point of fact, one "deal" promised that the investor would receive $60,000 back, 21 days after "investing" $50,000—a twenty percent (20%) return for only twenty days, or a one hundred and eighty percent (180%) return on an annualized basis.

44.     In addition to the red flags associated with (a) the significant volume of closeout merchandise that was purportedly going to be sold; (b) the huge returns promised to investors to be derived from the sale of such merchandise; and (c) the relatively short period of time proposed for the deal to consummate, the *documentation* that was presented to the investors to

perpetuate and further the Scheme--the "purchase orders" and "sales contracts" themselves--also contained "red flags" that should have put the investors on notice that the Debtors were not operating a legitimate business operation.

45.     In many instances, for example, the invoices and purchase orders were incredibly simplistic—often consisting of a single page or, in some instances, specifically referring to an attached document (which would have purportedly described or referenced the merchandise in detail) but did not actually attach the document at issue.

46.     In other cases, the paperwork simply proposed that the goods would be bought for the round sum of $1 million and then re-sold for another round number of $1.3 million (with the investor "sharing"—with Pressman and PJI—in the $300,000 profit).

47.     Similarly, many "purchase orders" and "sales orders" were identical "visually" (*i.e.*, in style and format)—in other words, the purchasing vendor's purchase order matched the PJI sales order in every possible way, despite supposedly being from different entities.  Because paperwork from different merchants usually looks different—different logos, different style, different font size, different layout of the contents of the purchase order and/or sales order—the fact that the documents, if any, that were presented to the investors were nearly identical in almost every way should have caused the investors to pause or shy away from such "deals" or, at the very least, to question the legitimacy of the deals.

48.     In addition, Pressman, on behalf of PJI, often presented investors with promissory notes that, on their faces, were poorly written, and "Participation Agreements" (purportedly to memorialize the deal) that one investor described, in retrospect, as "not kosher."

49.     Other documentation was suspect for additional reasons and should have raised red flags with the potential investors.

50.    For example, documentation for a transaction involving 400,000 assorted DVDs and books included a purchase order from Aceco Mills, Inc. ("Aceco").

51.    Aceco, however, is a seller and distributor of *home decorative items* (*e.g.,* pillows and bedding) and <u>does not carry or sell books or DVDs</u>, and, as such, would not (and did not) purchase the $520,000 worth of DVDs and books that PJI was purportedly selling to Aceco.

52.    In other purported transactions with Aceco, Pressman, on behalf of PJI and in furtherance of the Scheme, represented to investors that Aceco was purchasing $750,000 worth of sunglasses (also not home decorative items).

53.    As with the Aceco deal involving DVDs and books, had any investor bothered to conduct any modicum of due diligence, they would have realized that the purported "sunglasses deal" was bogus as well.

54.    Simply put, the materials presented to the investors contained significant information and abundant red flags that would cause a reasonable investor (or any reasonable and prudent person)—and certainly a sophisticated professional such as the Defendant—to inquire further.

55.    While some investors became suspicious of the transactions over time and even asked for sample products and/or invoices from the supposed deals, they continued to participate in the Scheme (even though they were never shown the requested products and/or invoices) due to the extraordinary profit each deal was generating for them.

56.    By the end of 2010, the Debtors could not continue to attract new investors to repay the old investors and the Scheme fell apart shortly thereafter in 2011.

57.    Until the collapse of the Scheme, Pressman dominated and controlled PJI and its business operations.

58.    Pressman concealed the actual nature of his and PJI's conduct during the operation of the Scheme.

59.    Any temporal limitations, statutory or otherwise, on the Trustee's ability to bring the causes of action set forth below were subject to equitable tolling as a result of, among other things, Pressman's domination of PJI and his fraudulent concealment of the Trustee's claims.

### Pressman Pleads Guilty.

60.    Following the collapse of Pressman's Scheme, Pressman was arrested, and on or about June 2, 2011, the United States Attorney for the Eastern District of Pennsylvania filed a Criminal Information (the "Information"), charging Pressman with wire fraud, mail fraud, and money laundering in violation of 18 U.S.C. §§ 1343, 1341, and 1956, respectively (the "Government Action").

61.    In particular, the Information charged, among other things, that from at least in or about June 2006 until in or about February 2011, Pressman made false and fraudulent statements to solicit investors to become partners with him and/or PJI by investing in various business deals that purportedly involved no-risk closeout merchandise deals, and promised exorbitant returns for the use of the investors' "capital;" *see, e.g.*, Information Count One ¶¶ 2, 4-5; that Pressman knew, at all relevant times, that virtually none of the closeout merchandise deals actually existed; *see, e.g., id.* ¶¶ 2, 6; that in that same time period, Pressman accepted more than $20 million from approximately 20 investors to carry out a "Ponzi" scheme that caused more than $6 million in losses by diverting those funds for his own benefit and to perpetuate the Scheme; *see, e.g., id.* ¶¶ 3, 8; and that Pressman caused other individuals and their companies to create false invoices and other documents and to engage in fraudulent wire transfer transactions to cover up his fraudulent scheme. *See, e.g., id.* ¶ 8.

62.    On July 22, 2011, pursuant to a formal Guilty Plea Agreement, Pressman pled guilty to all three counts of the Information and admitted to conducting the Scheme as alleged in the Information and as described herein.

63.    On February 10, 2012, Pressman was sentenced to more than 8 years in prison.

### DiClaudio's Involvement in the Scheme

64.    As described hereinabove and below, the essence of the Scheme was Pressman's description of fictitious business transactions, often including the presentation of fraudulent invoices, in exchange for money, promising significantly above-market interest rates and on extremely favorable terms to investors, particularly in respect to timing.

65.    Scott DiClaudio was one such investor, transferring at least $100,000.00 to the Debtors, purportedly as investments in various business deals between 2006 and 2011.

66.    Pressman, on behalf of himself and/or PJI, approached DiClaudio repeatedly with proposed transactions, and indeed DiClaudio partnered with the Debtors on at least two "deals".

67.    DiClaudio, like the other investors, knew or should have known that DiClaudio was getting an inflated return on the money given to the Debtors.

68.    Despite being a sophisticated and successful professional, DiClaudio never asked how Pressman, individually or on behalf of PJI, could guarantee such extraordinary returns in such a short timeframe, particularly when the rest of the economy was in utter shambles.

69.    Had DiClaudio taken sufficient reasonable steps to conduct sufficient independent investigation concerning the Debtors' proposed deals, DiClaudio would have realized (if he did not know it already) that the proposed transactions were fictitious.

70.     Rather than make sufficiently reasonable inquiries that would have revealed the fraudulent nature of the Scheme, DiClaudio turned away from what should have been obvious and, instead, invested in the Scheme in the hope of turning a huge profit.

71.     DiClaudio's profit, however, came at the expense of other investors.

72.     All together, DiClaudio invested a total amount of money in the sum of $100,000.00 (the "Principal Payments") in the Scheme, but received payments from the Debtors—made to one or more accounts held or controlled by DiClaudio—totaling at least in the sum of $129,000.00 (the "Transfers"). The dates and amounts of each of the Principal Payments and the Transfers are listed in the attached Exhibit A, as further described hereinbelow. [6]

73.     Thus, DiClaudio received at least $29,000.00 over and above the return of his investment, which $29,000.00, as such, constitutes "winnings" or "profit" from DiClaudio's participation in the Scheme.

74.     Upon information and belief, DiClaudio never reported any of this "profit" from his dealings with the Debtors to the appropriate taxing authorities.

75.     Moreover, had DiClaudio performed a reasonable amount of due diligence, he could have easily confirmed that the deals that the Debtors presented were in fact complete fabrications.

76.     DiClaudio's failure to conduct reasonable due diligence allowed the Debtors to perpetuate and extend the fraud to new victims, many of whom were not repaid in full as DiClaudio was.

---

[6] Supporting documentation for the Transfers identified in the referenced exhibit can be made available subject to the entry of a mutually acceptable confidentiality agreement.

## CLAIMS FOR RELIEF

### COUNT I
### STATE TRANSFERS
### PENNSYLVANIA FRAUDULENT TRANSFERS
### 12 Pa. C.S. § 5104(a) and 11 U.S.C. § 544(b)

77.    Plaintiff adopts and alleges the averments set forth in Paragraphs 1 through 76 as if set forth herein at length.

78.    As described herein, DiClaudio was a beneficiary of the Scheme beginning at least in July 2006 and thereafter.

79.    During the lifetime of the Scheme, including, but not limited to, during the four (4) year period immediately preceding the Petition Date, the Debtors transferred the sum of $129,000.00 to the Defendant (the "Transfers").

80.    The dates and amounts of the Transfers of which the Trustee is presently aware[7] are listed in the schedule attached hereto as Exhibit A and incorporated herein by reference.

81.    All of the Transfers were made by or on behalf of one or more of the Debtors and came from an account or accounts owned by one or more of the Debtors.

82.    Thus, each of the Transfers constituted a transfer of the Debtors' interest in property.

83.    At the time the Transfers were made, the Debtors were insolvent as the Debtors' liabilities exceeded their assets.

---

[7] During the course of this proceeding, the Trustee may learn (through discovery or otherwise) of additional transfers made to the Defendant. It is the Trustee's intention to avoid and recover all transfers made by the Debtors of an interest of the Debtors in property and to or for the benefit of the Defendant or any other transferee. The Trustee reserves the right to amend this Complaint to include: (i) further information regarding the Transfers, (ii) additional Transfers, (iii) modifications of and/or revision to the Defendant's name, and/or (iv) additional defendants that may become known the Trustee Plaintiff at any time during this adversary proceeding, through formal discovery or otherwise, and for all such amendments to relate back to the date of filing of this original Complaint.

84.     In addition, at the time the Transfers were made, the Debtors were experiencing significant cash flow problems which led to their inability to pay their debts as they became due, particularly as the Debtors were not operating legitimate businesses but, rather, were using the monies received from newer investors to repay prior investors.

85.     As alleged more fully above, until the collapse of the Scheme, Pressman dominated and controlled PJI and its business operations and concealed the nature of his and PJI's conduct, including, but not limited to, the amounts and frequencies of the transfers to the Defendant, during the operation of the Scheme.

86.     As such, any temporal limitations, statutory or otherwise, on the Trustee's ability to bring suit against the Defendant were subject to equitable tolling as a result of, among other things, Pressman's domination of PJI and his concealment of the fraud.

87.     All of the Transfers were made either within the four (4) year period immediately preceding the Petition Date or within any applicable tolling period related to the Debtors' concealment of the fraud.

88.     All of the Transfers were made to or for the benefit of the Defendant, and were deposited into a bank account owned by the Defendant.

89.     The Debtors made the Transfers to the Defendant in order to provide him with the "promised return" on the Defendant's prior investments.

90.     As such, all of the Transfers were made in furtherance of the Scheme, as the Debtors specifically intended to make these transfers to the Defendant as a means of hindering, delaying, or defrauding creditors as but for these transfers to the Defendant (and other similarly situated investors), the Scheme would have collapsed.

91.    At the time the Transfers were made, the Debtors had at least one creditor in existence prior to making each of the Transfers.

92.    Pressman's Plea Agreement, guilty plea, and sentencing in the Government Action, whereby Pressman admitted under oath that he engaged in a Ponzi Scheme which involved the making of transfers to investors similar to the Transfers the Debtors transferred to the Defendant, is *prima facie* evidence of the Debtors' actual intent to hinder, delay, or defraud creditors pursuant to 12 Pa. C. S. § 5104(a)(1).

93.    In light of Pressman's Plea Agreement and the fact that the Transfers were made in furtherance of the Scheme, all of the Transfers were made with actual intent to hinder, delay or defraud one or more creditors of the Debtors.

94.    Even if Pressman did not plea, the Transfers were made with the intent to hinder, delay or defraud one or more creditors as these transfers were made in furtherance of the Scheme; moreover had these transfers not been made, the Scheme (like all Ponzi schemes) would have unraveled.

95.    Based on the foregoing, the Transfers constitute avoidable fraudulent transfers pursuant to 12 Pa. C.S. § 5104(a) and Section 544(b) of the Bankruptcy Code.

96.    Despite prior demand, the Defendant has failed and refused to return the Transfers (or the monetary equivalent thereof) to the Plaintiff.

WHEREFORE, Plaintiff is entitled to avoid and recover, for the benefit of the unsecured creditors of the Debtors, (i) the Transfers; and (ii) interest upon such amounts to the extent recoverable pursuant to the law; and (iii) reasonable attorneys' fees and costs.

## COUNT II
## RECOVERY OF AVOIDED TRANSFERS
## 11 U.S.C. § 550

97.     Plaintiff adopts and alleges the averments set forth in Paragraphs 1 through 96 as if set forth herein at length.

98.     Based upon the foregoing, the Plaintiff is entitled to avoid the Transfers pursuant to Bankruptcy Code sections 544(a), 544(b), 548(a)(1)(A), and 548(a)(1)(B).

99.     As set forth on Exhibit A, the Defendant was the initial transferee or was the immediate or mediate transferee of such initial transferee of the Transfers and is liable for the return of the Transfers (or the amount thereof).

100.    Pursuant to Bankruptcy Code section 550(a), the Plaintiff is entitled to recover from the Defendant the Transfers or the amount thereof plus interest thereon to the date of payment as well as costs of this action.

WHEREFORE, Plaintiff is entitled to avoid and recover, for the benefit of the unsecured creditors of the Debtors, (i) any payments received by the Defendant, pursuant to 11 U.S.C. §§ 544(a), 544(b), 548(a)(1)(A), 548(a)(1)(B), and 550; and (ii) interest upon such amounts to the extent recoverable pursuant to the law.

## COUNT III
## UNJUST ENRICHMENT

101.    Plaintiff adopts and alleges the averments set forth in Paragraphs 1 through 100 as if set forth herein at length.

102.    In light of the Defendant's improper actions, as described hereinabove, the Defendant has been unjustly enriched by his receipt of other people's monies in connection with the Scheme.

103.    The Debtors conferred significant monetary benefits upon the Defendant in the form of payments to the Defendant, which payments included other people's "investments" in the Scheme.

104.    As detailed herein, the Defendant was aware of, and had knowledge of, the benefits conferred upon him by the Debtors.

105.    Under these circumstances, as described hereinabove, it would be unjust and inequitable to permit the Defendant to retain the moneys he wrongfully and passively received, especially as a significant percentage of that money included other people's "investments."

106.    Plaintiff is therefore entitled to disgorgement and restitution of all economic benefits that the Defendant derived from the Debtors.

WHEREFORE, Plaintiff demands judgment against the Defendant in an amount to be determined at trial, including but not limited to attorneys' fees and costs, prejudgment interest, and any and all such other further relief as the Court deems necessary and proper.

## COUNT IV
## DAMAGES FOR USURY
### 41 Pa. C.S. §§ 101 *et seq.* and 18 Pa. C.S. §§ 4806 *et seq.*

107.    Plaintiff adopts and alleges the averments set forth in Paragraphs 1 through 106 as if set forth herein at length.

108.    In connection with the money received by the Debtors from investors, the Debtors sometimes issued to the investors certain "Judgment Notes" and/or other documents, purportedly documenting the money as "loans" to the Debtors.

109.    Notwithstanding the existence of these "Judgment Notes", the Debtors considered the people who gave them money as "investors".

110.    Upon information and belief, the "investors", including DiClaudio, equally considered Pressman to be their "business associate".

111.    Either way, these "investors", including DiClaudio, knew that they were giving the Debtors money to "invest" in these purported deals.

112.    While the Trustee believes that the money given to the Debtors constituted an investment in the Scheme, to the extent these investors, including DiClaudio, considered this money to be a "loan" to the Debtors, such "loans" violated Pennsylvania's usury laws.

113.    In addition, irrespective of whether the money given to the Debtors was an investment or a loan, DiClaudio failed to report either the income or the interest earned on such loans to the appropriate taxing authorities.

114.    As detailed more fully in certain documents, including, but not limited to, certain "Judgment Notes" issued by Pressman to DiClaudio,[8] at the time DiClaudio agreed to "loan" money to the Debtors, he intended to charge, assess, take, or receive more than the legal rate of interest from the Debtors in return for making such "loans."

115.    Pennsylvania law defines "Criminal Usury" as "charging, taking or receiving any money, things in action or other property as interest on the loan or forbearance of any money, things in action or other property, at a rate exceeding thirty-six per cent per annum or the equivalent rate for a longer or shorter period, when not otherwise authorized by law." 18 Pa. Cons. Stat. § 4806.1(h).

---

8 During the course of this proceeding, the Trustee may learn (through discovery or otherwise) of additional "Judgment Notes" provided to DiClaudio. It is the Trustee's intention to seek Usury Damages in connection with any/all unlawful loans made by the Debtors to or for the benefit of DiClaudio. The Trustee reserves the right to amend this Complaint at any time during this adversary proceeding, through formal discovery or otherwise, and for all such amendments to relate back to the date of filing of this original Complaint.

116.    As set forth herein, the Debtors paid the Defendant a rate of interest at a rate in excess of that provided for by law.

117.    On or about December 5, 2006, DiClaudio gave Pressman the sum of $50,000.00 and Pressman promised to pay, on or before March 5, 2007, "the total sum of $50,000 with interest in the sum of $13,000 without defalcation, for value received." The interest rate on this transaction totaled 26% for the 3 month period, totaling 104% on an annualized basis.

118.    The interest provided for in the Judgment Note and received by the Defendant greatly exceeds on an annualized basis Pennsylvania's usury rate and, thus, is usurious pursuant to 18 Pa. C.S. §§ 4806 *et seq.*

119.    Because the interest provided for in the Judgment Note is criminally usurious, any obligation Pressman may have otherwise had to the Defendant under the Judgment Note is unenforceable and the Defendant, by law, must be required to pay to Plaintiff damages in an amount to be determined at trial, including, without limitation, triple the amount of the excess interest paid and attorneys' fees and costs (the "Usury Damages").

WHEREFORE, Plaintiff demands judgment against the Defendant as follows: (a) awarding Plaintiff the Usury Damages totaling triple the amount of excess interest paid to Defendant; (b) declaring that any obligation of Pressman to the Defendant is unenforceable and that the Defendant may not collect any amounts from the Debtors, including through the filing of a proof of claim in the Debtors' bankruptcy cases, and may not plead the entitlement to such amounts in defense to any claim in this case; and (c) awarding Plaintiff her attorneys' fees and costs, prejudgment interest, and any and all such other further relief as the Court deems necessary and proper.

**RELIEF REQUESTED**

**WHEREFORE**, Plaintiff respectfully requests the entry of judgment in her favor and granting the following relief:

1.      Avoiding the Transfers, or any and all portions thereof, and permitting the Trustee to recover the Transfers, or the value thereof;

2.      Directing the Defendant to immediately pay the Trustee the amount of the Transfers, or any and all portions thereof, plus interest thereon and costs, pursuant to 11 U.S.C. § 550(a);

3.      Declaring that the interest called for and received by the Defendant pursuant to the Judgment Notes is usurious, and awarding Plaintiff the Usury Damages totaling triple the amount of excess interest paid to the Defendant;

4.      Declaring that any obligation of the Debtors vis-à-vis the Defendant is unenforceable and that the Defendant may not collect any amounts from the Debtors, including through the filing of a proof of claim in the Debtors' Bankruptcy Cases, and may not plead the entitlement to such amounts in defense to any claim(s) in this case;

5.      Awarding prepetition and postpetition interest on the amounts owed by the Defendant to the full extent allowable under applicable law;

6.      Awarding pre-judgment interest on all Transfers from the date of the Transfers until the date of the judgment at the maximum legal rate and to the full extent allowable under applicable law;

7.      Awarding post-judgment interest at the maximum legal rate from the date of judgment herein until the date the judgment is either paid in full or otherwise satisfied, together with the costs and expenses of this action, including, without limitation, attorneys' fees;

8.      Awarding compensatory damages in favor of the Trustee against the Defendant for all damages sustained as a result of Defendant's wrongdoing, in an amount to be proved at trial, including interest thereon;

9.      Awarding appropriate restitution to the Trustee from the Defendant for Defendant's unjust enrichment;

10.     Awarding the Trustee punitive and/or exemplary damages where such damages are available; and

11.     Granting such other and further relief as the Court may deem just and proper.

DUANE MORRIS LLP

Lawrence J. Kotler
Kelly D. Eckel
30 South 17th Street
Philadelphia, PA  19103
Telephone: 215.979.1514
Facsimile: 215.979.1020

*Counsel for Lynn Feldman, the Chapter 7 Trustee*
*for the bankruptcy estates of Ira J. Pressman and*
*PJI Distribution Corp.*

DM3\2105197.2

- 25 -

**EXHIBIT A**

| DATE | PRINCIPAL PAYMENTS | TRANSFERS |
|---|---|---|
| 7/10/2006 | 50,000.00 | |
| 10/6/2006 | | 50,000.00 |
| 10/10/2006 | | 15,500.00 |
| 12/8/2006 | 50,000.00 | |
| 2/23/2007 | | 63,500.00 |
| | | |
| TOTAL | $100,000.00 | $129,000.00 |